UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Gary Allen Kachina, | Civil No. 06-cv-5125 (ADM/JJG) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Lynn Dingle, Ronald Olson, Thomas Schmidt, and Hans Meizinger, | |
| Defendants. | |

---

This is a 42 U.S.C. § 1983 case brought by Plaintiff Gary Allen Kachina ("Kachina") against the warden and three corrections officers at the Minnesota Correctional Facility in Stillwater ("Stillwater"). Kachina alleges that the four Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment.

The matter is before the Court on the Defendants' motion to dismiss and for summary judgment (Doc. No. 48). The Court recommends that Defendants' motion be granted in part and denied in part as set forth below.

**I.   BACKGROUND**

Kachina is a Minnesota state prisoner incarcerated at the Minnesota Correctional Facility in Lino Lakes ("Lino Lakes"). *Aff. of Kim Ebeling*, Ex. A. Kachina entered the Minnesota Department of Corrections' custody in October 2004, after a Hennepin County jury convicted him of two counts of first-degree burglary.[1]

Kachina's lawsuit centers on allegations that Stillwater prison officials failed to protect him from other prisoners. He sues former Stillwater Warden Lynn Dingle ("Dingle"),

---
[1] Kachina was sentenced to serve 53 months for the burglary convictions.

corrections officers Ronald Olson ("Olson") and Hans Meizinger ("Meizinger"), and corrections sergeant Thomas Schmidt ("Schmidt").

### A.     Moose Lake

In 2005, Kachina was incarcerated at the Minnesota Correctional Facility at Moose Lake ("Moose Lake").  Native American prisoners at Moose Lake, including Kachina, were allowed to participate in pipe ceremonies and sweat lodges.  *Aff. of Deb Bottomley*, ¶ 4.  They were also allowed to have medicine bags, which generally contain tobacco, provided the bag was tied or sewn shut when not in ceremonial use.  *Aff. of Julie Nummela*, ¶ 3.  Some Native Americans consider medicine bags sacred.  *Id.* at ¶ 5.  A prisoner with an unsealed medicine bag puts other Moose Lake Native Americans at risk of being searched for unsealed medicine bags and jeopardizes the group's ability to hold future ceremonies.  *Id.  See also Aff. of Timothy Strom*, ¶ 5.

On August 5, 2005, a Moose Lake corrections officer found an unsealed medicine bag in Kachina's cell.  *Nummela Aff.* at ¶ 5.  Kachina told a Moose Lake investigator that he had given the tobacco to another offender.  *Strom Aff.* at ¶ 4.  That offender was disciplined for possession of unsealed tobacco and homemade alcohol.  *Id.* at ¶ 6.

After the unsealed medicine bag was found in his cell, Kachina told a Moose Lake watch office commander that he was afraid the other Native American offenders were "out to get him."  *Bottomley Aff.* at ¶ 5.  The watch office commander described Kachina as "visibly shaking."  *Id.* at ¶ 3.  Kachina was transferred to another cell the same day as the medicine bag incident.[2]  *Strom Aff.* at ¶ 10.

Kachina contends that, due to the medicine bag incident, other Native Americans at Moose Lake considered him a snitch and "had a hit out on him."  *Amended Complaint*; *Strom*

---

[2] The record is unclear whether this transfer was to segregation or another area of Moose Lake.

*Aff.* at Ex. A. Kachina stopped attending Native American ceremonies at Moose Lake. *Strom Aff.* at ¶ 10. One Native American offender at Moose Lake told a prison investigator that "he was trying to keep Kachina on a lower profile because Kachina was drawing negative attention to the Native American group." *Id.* at ¶ 11.

The Minnesota Department of Corrections transferred Kachina to Stillwater on September 8, 2005, approximately one month after finding his open medicine bag. *Ebeling Aff.* at Ex. B.

### B. Stillwater

While at Stillwater Kachina became frightened, and complained many times to prison officials that he was afraid of the other Native American offenders. *Aff. of Lisa Stenseth*, ¶ 6. He frequently refused to leave segregation because he was afraid to reside in the general Stillwater prison population. *Stenseth Aff.* at ¶ 6; *Aff. of Michael Parks*, ¶ 7. Kachina had a reputation at Stillwater for frequently complaining to staff and writing kites. *Parks Aff.* at ¶ 5.

On May 16, 2006, Kachina told Lieutenant Putzier, a Stillwater corrections officer, that a Stillwater inmate named Robert Forrest was spreading a rumor that Kachina was a snitch. *Aff. of Timothy Putzier*, ¶¶ 5, 6. Kachina feared that Forrest was inciting other inmates to assault him. Putzier told Kachina that the Stillwater Incompatibility Review Committee would review his concerns. *Id.* at ¶ 6. The Incompatibility Review Committee met on May 19, 2006, and determined that insufficient evidence existed to separate Kachina and Forrest. *Id.* at ¶ 7.

On July 30, 2006, Kachina wrote Stillwater Assistant Warden John King a kite expressing his safety concerns about being released to certain prison areas when he left segregation. *Aff. of John King*, Ex. A. Kachina stated that inmates in several cell blocks wanted to hurt him. *Id.* Kachina requested a transfer to another facility, release to Cell Hall D at

3

Stillwater, or continued segregation. *Id.* at Ex. A. Putzier investigated Kachina's concerns, but took no further action as Kachina did not provide him names of the offenders he feared. *Putzier Aff.* at Ex. A.

In September 2006, Kachina wrote a letter to an Assistant Commissioner at the Minnesota Department of Corrections detailing his concerns regarding safety and prison staff misconduct. *Aff. of Terrill Florcyk*, ¶ 2. In response, Terrill Florcyk, an investigator from Stillwater's Office of Special Investigations, interviewed Kachina on September 19, 2006. *Id.*

Kachina told Florcyk that he feared for his safety, because he could hear other offenders talking about him in segregation. He explained that these offenders made comments reflecting that they knew about his history at Moose Lake and thought he was a snitch. He could not identify these offenders by name because, while he could hear them talking in segregation, he could not see them. *Id.* Kachina also stated that he believed Defendant Olson had given a copy of his Moose Lake discipline report regarding the medicine bag incident to offenders in segregation, because they knew about the report. *Id.* at ¶ 3. Kachina stated that he did not want to be released from segregation for exercise for the remainder of the week due to his concerns. *Id.* at Ex. A.

Florcyk determined that Kachina's allegations were too "vague" due to Kachina's failure or inability to name the offenders he feared. Florcyk took no further action, other than confirming with the segregation unit head that Kachina would not go out for exercise. *Id.*

On September 21, 2006, Kachina was released from segregation to Cell Hall B West. The same day, Kachina told a Stillwater case manager that he did not feel safe in Cell Hall B West. *Stenseth Aff.* at ¶ 4. Kachina informed the case manager that while in segregation he had received several threats from five Native American offenders, and another unknown offender.

4

*Id.* He stated that these offenders knew of his Moose Lake history and considered him a snitch. *Id.* Kachina identified the five Native American offenders by name. *Id.* The Stillwater case manager placed Kachina on investigative restrictive status, meaning he was locked in his cell pending investigation of his concerns. *Id.* She referred Kachina's concerns to Stillwater's Office of Special Investigations and Incompatibility Review Committee. *Id.*

On September 22, 2006, Defendant Schmidt, a Stillwater corrections officer on Cell Hall B West, spoke with Kachina about his concerns. *Aff. of Thomas Schmidt*, ¶ 3. During Schmidt's subsequent investigation, he noted that Kachina had given his case manager five names of inmates who were threatening him. He also noted that Kachina had told his case manager that when he moved to Cell Hall B West, a group of Native Americans had gathered outside his cell and were intimidating him. *Id.* Schmidt reviewed prison videotape for the relevant time period and did not see any such gathering. *Id.* Schmidt also interviewed the two prisoners living in Cell Hall B West that Kachina had identified as threats. One indicated that he did not know Kachina; the other said he had no problem with him. *Id.*

Kachina was moved to Cell Hall D on September 22, 2006, pending review of his concerns by the Stillwater Incompatibility Review Committee. *Id.*

The Incompatibility Review Committee investigated Kachina's complaints regarding the two Cell Hall B West offenders Kachina had identified, and did not find sufficient evidence to separate Kachina from them. *Aff. of Michael Parks*, ¶ 4. Consequently, on September 28, 2006, Kachina returned to Cell Hall B West. *Id.*

The same day, Kachina wrote a note to prison staff, stating, "I feel like hurting myself. I need to talk to someone. I can't take this no more." *Aff. of Wayne Frederick*, ¶ 3. Kachina was placed in segregation on observation status the same day. *Id.* at Ex. A.

5

On October 3, 2006, Kachina gave Putzier two additional names of offenders he feared would harm him, and a name of a witness who would support the veracity of his concerns. *Schmidt Aff.* at ¶ 4.  Schmidt investigated Kachina's concerns and determined that the offenders had no problems with Kachina.  *Id.*  Kachina's witness stated that he had not heard other offenders threaten Kachina, but was aware of Kachina's concerns and thought they were valid. *Id.*

Also on October 3, 2006, Kachina wrote Assistant Warden King asking that he live in Cell Hall D upon his release from segregation.  *King. Aff.* at ¶ 2.  King approved his request. From that point forward, Kachina was always released to Stillwater's smaller, quieter units of Cell Hall D or A West upon completing time in segregation.  *Id.*

On November 20, 2006, Kachina met with his case manager and again raised safety concerns.  *Stenseth Aff.* at ¶ 5.  Kachina did not provide any names of offenders who had threatened him, stating that he did not trust the prison staff.  *Id.*

      **C.**      **December 2006 Assault**

On December 8, 2006, while Kachina was in segregation, Defendant Meizinger approached him in his cell about a complaint Kachina had written requesting clean socks. Kachina alleges that he told Meizinger that he needed clean socks, and that Meizinger then told the inmate laundry workers that Kachina had written a complaint about them for failing to do their jobs.  Kachina also alleges that Meizinger threatened the laundry workers with the loss of their jobs if they failed to give Kachina clothes.  *Amended Complaint*, p. 5.  Meizinger states that he simply asked the laundry workers to get Kachina some clothes.  *Meizinger Aff.* at ¶ 5.

Two inmates in segregation with Kachina on December 8, 2006, Brent Tanner and Robert Brantley, state that they heard Meizinger tell other inmates that Kachina was writing kites

6

and telling on inmates for not doing their jobs. *Decl. of Brent Tanner*; *Decl. of Robert Brantley*, *Aff. of Margaret Jacot, Kachina Depo.*, Exs. 11 and 12. These inmates also overheard other inmates calling Kachina a snitch. *Id.*

After Meizinger talked to the laundry workers about Kachina's request, the workers confronted Kachina, asking him why he had "snitched" on them for not doing their jobs. *Depo. of Robert Brantley*, *Aff. of Margaret Jacot*, Ex. B, pp. 19-20. Inmate Brantley states that he heard one of the laundry workers, a Native American, speak to another inmate in segregation known for assaulting snitches, Ian Archer, and told him that Kachina was a snitch. *Id.* at 21.

On December 10, 2006, Tanner heard Defendant Olson tell inmate Archer that Kachina was a snitch and that "he was telling on everybody." *Tanner Decl.* The same day, Archer assaulted Kachina. *Id.*; *Brantley Decl.* The assault occurred the first time Kachina and the other inmates were let out of their cells after Meizinger confronted the laundry workers about Kachina's complaint. *Jacot Aff.* at Ex. A., *Kachina Depo.* at 50.

Archer initiated the assault. *Olson Aff.* at ¶ 7; *Aff. of David Christensen*, ¶ 3. Archer asked Kachina to show him his drawings. When Kachina turned his back to retrieve them, Archer started beating him, including hitting him on the head with a makeshift weapon consisting of a bar of soap in a sock. *Brantley Depo.* at 26. During and after the beating, Tanner and Brantley heard Archer and other inmates calling Kachina a snitch. *Tanner Declar.*; *Brantley Declar.*; *Brantley Depo.* at 22.

Kachina's lips and gums bled severely due to Archer's beating, and he suffered bruising and head and back pain for weeks. *Plaintiff's Memorandum*, pp. 3-4. *See also Amended Complaint*. He states that he still has back pain. *Id.* Kachina also alleges that the Archer

7

incident and his label as a "snitch" caused him severe depression, anxiety attacks, and to fear for his life. *Id.*

### D. Supervised Release and Return to Prison

Kachina was released from Stillwater on supervised release on June 28, 2007. *Ebeling Aff.*, Ex. A. He returned to prison at Lino Lakes on December 6, 2007, for violating the conditions of that release. *Id.*

### E. Lawsuit

Kachina filed this action under 42 U.S.C. § 1983 seeking damages and injunctive relief for Defendants' alleged failure to protect him from other inmates. On January 31, 2008, the Defendants moved to dismiss and for summary judgment, the motion currently before the Court.[3]

## II. LEGAL STANDARD

### A. Motion to Dismiss

When considering a motion to dismiss, a court construes the pleadings in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. *Hamm v. Groose*, 15 F.3d 110, 112 (8th Cir. 1994). "A motion to dismiss should be granted as a practical matter ... only in the unusual case in which the plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. 1995). However, to survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, --U.S.--, 127 S.Ct. 1955, 1974 (2007).

---

[3] Kachina moved for a temporary restraining order on January 2, 2008. He has since withdrawn that motion, and it is, therefore, no longer before the Court. Kachina also moved to compel the Defendants to produce certain documents. The Court has issued an order granting in part and denying in part that motion.

### B. Summary Judgment

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. *See Celotex*, 477 U.S. at 322; *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 224 F.3d 735, 738 (8th Cir. 2000). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). The Court views the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. *See Brown v. Fortner*, 518 F.3d 552, 555 (8th Cir. 2008).

## III. ANALYSIS

Defendants move to dismiss Kachina's damage claims against them in their official capacities based on sovereign immunity. They seek summary judgment on Kachina's remaining claims, arguing that no genuine issue of material fact exists on the merits of his Eighth Amendment claims, and that qualified immunity protects them as a matter of law.

### A. Eighth Amendment Failure to Protect

Kachina asserts that Defendants breached their duty to protect him from other prisoners. He contends that he continuously warned the Defendants that other inmates wanted to harm him, but that they took inadequate measures to protect him. He asserts that certain Defendants also took affirmative steps that endangered his safety. He alleges that these actions and inactions

9

ultimately resulted in his physical assault on December 10, 2006, and caused him to live in continuous fear for his safety.

Defendants respond that Kachina never gave them sufficient information to substantiate his concerns that he was in danger. They also assert that they reasonably responded to Kachina's concerns based on the information he provided. They seek summary dismissal of Kachina's Eighth Amendment claims both on the merits and based on qualified immunity.

### 1. Failure to protect legal standard

"Suffering physical assaults in prison is not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Benefield v. McDowall*, 241 F.3d 1267, 1271 (10th Cir. 2001) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Under the Eighth Amendment, "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (citations omitted); *Reece v. Groose*, 60 F.3d 487, 491 (8th Cir. 1995).

Where a prisoner asserts that a prison official failed to protect him from harm, he must make a two-pronged showing: 1) that he is incarcerated under conditions posing a substantial risk of serious harm; and 2) that the official displayed deliberate indifference to inmate health or safety. *Id.* at 835. Prong one of the test is an objective inquiry. Prong two is subjective, exploring whether the prison official has "a sufficiently culpable state of mind." *Id.*

The deliberate indifference test requires that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. This standard does not require the official to actually believe that the inmate will be harmed. "It is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842.

Whether a prison official acted with the requisite state of mind is a question of fact. *Id.* at 842. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (citation omitted).

Even if a prison official was aware of the risk posed to a prisoner, Eighth Amendment liability is precluded where the official responded reasonably to the risk. *Id.* at 844.

### 2. Schmidt

No genuine issue of material fact exists with respect to Kachina's Eighth Amendment claim against Defendant Schmidt.

Schmidt was the corrections officer assigned to Stillwater Cell Hall B West at the time of the events underlying Kachina's Amended Complaint. He investigated Kachina's complaints regarding other prisoners twice, on September 22 and October 3, 2006. Kachina alleges that Schmidt labeled him as a snitch and an informant to other prisoners and failed to protect him after he complained.

A prison official's labeling of an inmate as a snitch implicates the Eighth Amendment duty to protect. *See Reece*, 60 F.3d at 491; *Benefield*, 241 F.3d at 1271; *Valandingham v. Bojorquez*, 866 F.2d 1135, 1138 (9th Cir. 1989). Kachina's bare suspicion that Schmidt labeled him a snitch, however, does not create a genuine issue of material fact that Schmidt exposed him to harm. *See* Fed. R. Civ. P. 56(e); *Doe v. Dept. of Veterans Affairs of U.S.*, 519 F.3d 456, 460 (8th Cir. 2008) (citations omitted). The record shows that Schmidt investigated two of Kachina's safety complaints. As part of these investigations, he interviewed the prisoners Kachina feared residing in Cell Hall B West, the area Schmidt oversaw. He also reviewed prison videotape to determine if Kachina's concerns were substantiated. While his investigation included asking those individuals whether they had any problems with Kachina, the record does not reflect that

11

he labeled Kachina as a snitch or informant, or even that he told them that Kachina complained regarding them. *Jacot Aff.* at Ex. A, *Kachina Depo*. at 44. Kachina's bare suspicion that Schmidt called him a snitch in those meetings is insufficient to survive summary judgment. *Doe*, 519 F.3d at 460.

Moreover, even thought Schmidt's investigation did not substantiate Kachina's claims, prison officials further investigated his complaints in accordance with Stillwater's incompatibility review policy. Schmidt moved Kachina from Cell Hall B West, the prison area he feared, to the quieter areas he sought after both complaints he investigated. After his October 3, 2006, complaint, Kachina never returned to Cell Hall B West, but, as he requested, lived in segregation or in the smaller, quieter units of Cell Hall D or A West. Thus, the Court finds that Schmidt acted reasonably in promptly moving Kachina out of Cell Hall B West after his complaints. *See Farmer*, 511 U.S. at 844-845; *Devose v. Rittenhouse*, 92 F.3d 1189, 1189 (8th Cir. 1996). Due to this reasonable response, Eighth Amendment liability is precluded with regard to Schmidt. *Id.*

### 3. Dingle

Kachina's Eighth Amendment claim with respect to former Warden Dingle also fails as a matter of law. Kachina names Dingle as a Defendant, but fails to adequately articulate any theory of liability regarding Dingle or offer evidence tending to support any such theory.

"A supervisor may not be held liable under § 1983 for the constitutional violations of a subordinate on a respondeat superior theory." *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001) (citing *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir.1995)). Rather, a supervisor's liability arises where:

> [H]e directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights. The plaintiff must demonstrate that the supervisor was deliberately indifferent to or tacitly authorized the offending acts. This requires a showing that the supervisor had notice that the training procedures and supervision were inadequate and likely to result in a constitutional violation.

*Tlamka*, 244 F.3d at 635 (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir. 1996)).

Kachina does not argue, nor does the record support, that Dingle was directly involved in the failure to protect claims he alleges. In his Amended Complaint, Kachina alleges that Dingle was aware of the harm Kachina faced, but did nothing. The record, however, is devoid of any facts reflecting either that Dingle was deliberately indifferent to or tacitly authorized the acts of which Kachina complains. Kachina's Eighth Amendment claim against Dingle, therefore, fails as a matter of law. *See Tlamka*, 244 F.3d at 635.

### 4. Olson and Meizinger

Kachina's Eighth Amendment claims against Defendants Olson and Meizinger survive summary judgment. Kachina has raised a genuine issue of material fact as to whether these Defendants were deliberately indifferent to his safety.

Labeling an inmate a snitch or an informant can subject a prisoner to a substantial risk of serious harm under the Eighth Amendment. *See Reece*, 60 F.3d at 491; *Benefield*, 241 F.3d at 1271; *Northington v. Marin*, 102 F.3d 1564, 1567 (10th Cir. 1996); *Valandingham*, 866 F.2d at 1138. *Reece* is the closest Eighth Circuit Court of Appeals case on point. In that case, inmate Reece had been an informant for the Drug Enforcement Administration, including testifying in trial against a criminal defendant. *Id.* at 487. The court, in the context of analyzing qualified immunity, addressed whether a prisoner with a reputation as a snitch faced a substantial risk of serious harm from other prisoners under the Eighth Amendment. *Id.* at 491. The court

answered that question in the affirmative, stating that the risk Reece faced "appears to be obvious in the circumstances of this case." *Id.*

Other circuit courts have specifically addressed the issue faced here: whether a prison official's labeling of an inmate as a snitch can give rise to Eighth Amendment liability. In *Benefield*, the Tenth Circuit Court of Appeals examined a prisoner's allegations that a corrections officer circulated rumors that he was a snitch and showed inmates a letter the prisoner wrote that made him appear to be an informant. 241 F.3d at 1270. Rejecting the officer's qualified immunity defense, the court held that "labeling an inmate a snitch has the potential for great harm and may violate constitutional guarantees." *Id.* at 1271.

Similarly, in *Valandingham*, the Ninth Circuit Court of Appeals held that a prisoner's allegations that prison officials labeled him a snitch because he had filed prison grievances stated Eighth Amendment, and possibly First Amendment, claims. 866 F.2d at 1138. *See also Harmon v. Berry*, 728 F.2d 1407, 1409 (11th Cir. 1984) (prisoner's allegations that prison officials labeled him a snitch sufficient to avoid dismissal as frivolous under 28 U.S.C. § 1915(d)).

This Court agrees that a prison official's labeling of a prisoner as a snitch or informant can expose that prisoner to a substantial risk of serious harm at the hands of other prisoners. In the instant case, there is a fact issue whether Defendants Olson and Meizinger labeled Kachina as a snitch, exposing him to a substantial risk of serious harm under the Eighth Amendment.[4]

Inmate Tanner submitted an affidavit stating that on December 10, 2006, he heard Olson tell Archer that Kachina was a snitch and that Kachina "was telling on everybody." Olson

---

[4] The Court recognizes that, in *Reece*, the prisoner was labeled a snitch due to his activity as a government informer before entering prison. Here, Kachina's snitch label stems from his complaints while in prison regarding other prisoner behavior. However, cases addressing the snitch label in the Eighth Amendment context do not distinguish among the types of snitching behavior. Rather, the focus is on whether the label exposes the prisoner to significant harm.

14

denies this. Tanner and another inmate, Brantley, also support Kachina's allegations that Meizinger similarly labeled him as a snitch to the laundry workers and to other inmates in segregation on December 8, 2006. Meizinger denies that he did so. Thus, a genuine issue of material fact exists regarding whether Meizinger and Olson labeled Kachina a snitch.[5]

Even if they did label him a snitch, Olson and Meizinger are not liable on an Eighth Amendment failure to protect claim unless they acted with deliberate indifference. The prison official's state of mind is generally a fact question. *Farmer*, 511 U.S. at 842. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that it was obvious." *Id.* In *Reece,* the court found that a factfinder could so conclude because the snitch label carries "obvious" ramifications in prison. *Id.* at 491. Similarly in *Benefield*, the court concluded, "[L]abeling an inmate a snitch satisfies the *Farmer* standard, and constitutes deliberate indifference to the safety of that inmate." 241 F.3d at 1271 (citing *Northington*, 102 F.3d at 1567).

Similarly, here Olson and Meizinger cannot escape liability on summary judgment based on the deliberate indifference standard. If they labeled Kachina a snitch to other inmates, including Archer who ultimately assaulted him, a fact question exists regarding whether they were sufficiently aware that doing so would expose him to harm.[6]

Olson and Meizinger appear to argue that are entitled to summary judgment because, even if they acted indifferently, no causal connection exists between their indifference and

---

[5] While neither side addressed the issue, the Court concludes that the statements by Meizinger and Olson contained in the inmate affidavits are not hearsay, as they are admissions by a party-opponent under Fed. R. Evid. 801(d)(2).

[6] Kachina also argues that Olson subjected him to harm by disseminating a copy of a disciplinary report regarding the medicine bag incident at Moose Lake. Olson denies this, and the Court finds no evidence to support Kachina's bare allegation. Kachina acknowledged in his deposition that Stillwater inmates found out about the Moose Lake incident through prisoner word of mouth. *Jacot Aff.*, Ex. A. at 13. *See also Florcyk Aff.* at ¶ 3.

Kachina's assault. They explain that Archer's assault of Kachina was not premeditated, and was simply "an argument that escalated into a fight." *Defs. Memo. of Law* at 18. As Defendants recognize in their brief, causation is generally a fact issue, and such an issue of fact exists on the record here. Archer attacked Kachina was a weapon he apparently fashioned before the fight. This suggests premeditation, not a random argument. Moreover, the affidavits and testimony of Tanner and Brantley create a material fact issue regarding causation.

### B.      Qualified Immunity

Olson and Meizinger argue that they are entitled to summary judgment on Kachina's damages claim against them based on the doctrine of qualified immunity. "Qualified immunity protects a government official from liability in a section 1983 action unless the official's conduct violated a clearly established constitutional or statutory right of which a reasonable person would have known.'" *Brown,* 518 F.3d at 558 (citing *Henderson v. Munn*, 439 F.3d 497, 501 (8th Cir. 2006)). *See also Reece,* 60 F.3d at 491. Defendants argue that no constitutional rights are at stake. They further argue that any such rights were not sufficiently clearly established to hold the Defendants to them under the qualified immunity standard.

#### 1.      Violation of a Constitutional Right

Kachina has raised a genuine issue of material fact regarding whether Defendants Meizinger and Olson labeled him a snitch and acted with deliberate indifference in violation of the Eighth Amendment. As these fact issues preclude summary judgment on the merits of Kachina's Eighth Amendment claim, so do they preclude the application of qualified immunity. *Brown*, 518 F.3d at 560 (affirming denial of qualified immunity on summary judgment where a reasonable jury could find an Eighth Amendment violation); *Reece*, 60 F.3d at 491 (affirming denial of qualified immunity on summary judgment where material fact issues existed regarding

whether prison officials took reasonable actions to protect prisoner); *Miller v. Schoenen*, 75 F.3d 1305, 1311 (8th Cir. 1996) (defendants not entitled to qualified immunity where fact issue existed regarding their deliberate indifference). This is particularly so where the substantial risk of serious harm faced by a prisoner considered a snitch by other inmates has been characterized as obvious and held to satisfy the *Farmer's* Eighth Amendment failure to protect standard. *See Reece*, 60 F.3d at 491; *Benefield*, 241 F.3d at 1272.

### 2. Whether the Constitutional Right was Clearly Established

This portion of the qualified immunity test examines whether the constitutional right at issue was sufficiently established to hold the officer to it under the circumstances of this case. "A right is clearly established if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Brown,* 518 F.3d at 561 (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). *See also Miller*, 75 F.3d at 1308 (citations omitted).

Several circuit courts of appeal, including the Eighth Circuit Court of Appeals, have recognized that when a prisoner is labeled a snitch, he is exposed to a substantial risk of serious harm from other prisoners implicating the Eighth Amendment. *Reece*, 60 F.3d at 491; *Benefield*, 241 F.3d at 1271; *Northington,* 102 F.3d at 1567; *Valandingham,* 886 F.2d at 1138. Nothing in the record before the Court distances the situation Meizinger and Olson confronted from these cases. Meizinger and Olson had "fair warning" that labeling a prisoner a snitch exposed that prisoner to a substantial risk of violence at the hands of other prisoners. *See Brown*, 518 F.3d at 561. Accordingly, the Court recommends that Defendants' motion for summary judgment based on qualified immunity for Meizinger and Olson be denied.

### C. Official Immunity

Kachina's damages claim against Meizinger and Olson in their official capacities is barred by the Eleventh Amendment. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("a suit against a state official in his or her official capacity is ... no different from a suit against the State itself"); *Andrus ex rel. Andrus v. Arkansas*, 197 F.3d 953, 955 (8th Cir. 1999) ("A claim for damages against a state employee in his official capacity is barred under the Eleventh Amendment"). The Court, therefore, recommends dismissal of this claim for lack of subject matter jurisdiction.[7]

## IV. RECOMMENDATION

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:** Defendants' motion to dismiss and for summary judgment (Doc. No. 48) be **GRANTED IN PART AND DENIED IN PART** as follows:

A. Defendants' motion for summary judgment be **GRANTED** as to Defendants Lynn Dingle and Thomas Schmidt.

B. Defendants' motion to dismiss be **GRANTED** as to Kachina's damages claims against Defendants Hans Meizinger and Ronald Olson in their official capacities.

C. Defendants' motion for summary judgment be **DENIED** as to the remainder of Kachina's claims against Defendants Hans Meizinger and Ronald Olson.

---

[7] The Defendants also requests that the Court rule as a matter of law that Kachina is not entitled to damages for mental and emotional injury based on 42 U.S.C. § 1997e(e). Kachina, however, alleged that he suffered physical injury. *Amended Complaint*. *See also Plaintiff's Memo.* (Doc. No. 28) at 3-4. Summary dismissal of his claim based on Section 1997e(e) is, therefore, unwarranted. *Id. See Munn v. Toney*, 433 F.3d 1087, 1089 (8th Cir. 2006).

Dated:  May 22, 2008                           s/ *Jeanne J. Graham*
                                              JEANNE J. GRAHAM
                                              United States Magistrate Judge


**NOTICE**

      Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **June 6, 2008**.  A party may respond to the objections within ten days after service.  Any objections or responses filed under this rule shall not exceed 3,500 words.  The District Court shall make a de novo determination of those portions to which objection is made.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the United States Court of Appeals for the Eighth Circuit.  Unless the parties stipulate that the District Court is not required, under 28 U.S.C. § 636, to review a transcript of the hearing in order to resolve all objections made to this report and recommendation, the party making the objections shall timely order and cause to be filed within ten days a complete transcript of the hearing.